**IN THE COURT OF APPEALS OF IOWA**

No. 15-1711
Filed December 21, 2016

**CONNIE KUNZ,**
        Plaintiff-Appellee,

**vs.**

**ROBERT KUNZ,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Lee County (South), Mary Ann
Brown, Judge.

        Robert Kunz appeals from a jury verdict in favor of Connie Kunz in her
breach-of-contract action. **REVERSED AND REMANDED.**

        James F. Dennis, Keokuk, for appellant.

        Curtis R. Dial of the Law Office of Curtis Dial, Keokuk, for appellee.

        Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**MCDONALD, Judge.**

Robert Kunz appeals from a jury verdict in favor of Connie Kunz in this breach-of-contract action. He contends the settlement memorandum signed by Connie and him were only preliminary negotiations and not a binding agreement. Even if it was a binding agreement, his obtaining financing was a condition precedent that did not occur. He challenges the court's refusal to give his proposed jury instructions regarding the condition precedent. He also challenges the district court's decision to allow evidence regarding his personal finances.

I.

Richard Kunz and Robert Kunz, brothers, started a business in 1973 called Happy Homes, Inc., which sold factory-built homes. This was a "family business," and Richard's wife, Connie, and Robert's wife, Dorothy, were actively involved. Richard and Robert jointly owned the business and 9.7 acres of real estate upon which Happy Homes was located. In 2007, Richard died, and his interest in Happy Homes went to Connie. In 2008, Connie and Robert began discussing the sale of the business. Initially, Connie was interested in purchasing Robert's share of the business and continuing to operate Happy Homes with her son, Denton. Connie and Robert eventually entered mediation, and, on April 23, 2010, Connie, Robert, Dorothy, and their respective attorneys all signed a document entitled "Settlement Memorandum."

The Settlement Memorandum stated,

> 1. Robert will purchase Connie's shares of stock in Happy Homes, Inc. for the sum of $250,000.00 including the real estate owned jointly by Connie and Robert and Dorothy. Curtis Dial and Hubert Staff [attorneys] will prepare all detailed agreements necessary for the purchase of the corporate stock and the real

estate. The escrow fund is to be intact as to be verified by the accountant. This agreement is subject to Robert Kunz being able to arrange financing for this purchase.

2. All of Connie's shareholder debt will be canceled.

3. Robert will seek to obtain a release by the bank on individual guarantees of corporate indebtedness by Connie.[1]

4. Robert agrees to indemnify Connie against corporate debt per the agreement prepared by the attorneys.

5. The real estate will be conveyed using normal real estate purchase and sale closing procedures. It is anticipated or expected that this matter will be closed within forty-five (45) days of this date.

6. Included in this agreement is the agreement of Robert to take over ownership of the individual homes owned by Connie and assume the debt on those homes.

7. Connie will receive the 1997 Chevrolet C-10 truck formerly used by Richard.

8. The parties agree to take all action and execute all documents necessary to effectuate this agreement.

On June 2, 2010, Robert's attorney notified Connie's attorney Robert and Dorothy "have been unsuccessful in obtaining a loan" and would not proceed with the purchase.

On June 28, 2010, Connie filed a breach-of-contract suit against Robert and Dorothy, which she subsequently dismissed without prejudice. On February 17, 2011, Robert and Dorothy filed suit against Connie for partition and liquidation of Happy Homes. The modular homes, real estate, and other assets of Happy Homes were sold at auction on May 5, 2012. Robert purchased the 1997 Chevrolet C-10 truck for $4000. The original purchaser of the real estate bid $160,000 but backed out, forfeiting a $16,000 down payment. Robert then purchased the real estate from Happy Homes. The proceeds from the sales of Happy Homes assets ($251,066.47) were placed in a trust account, outstanding loans to State Central Bank were paid off, as were attorney fees and other items,

---

[1] Connie had personally financed some of the model homes for Happy Homes with State Central Bank.

and, on October 25, 2012, $88,225.88 was distributed each to Connie and Robert.

Connie thereafter reinitiated her suit against Robert and Dorothy for breach of the settlement memorandum, seeking the difference between what she received from liquidation of the company and the purchase price set forth in the settlement memorandum. Dorothy was later dismissed as a party.

On July 7, 2015, Robert filed a motion in limine asking that the court exclude his personal financial statement as irrelevant. The court denied the motion noting,

> One of the issues in this case will be whether [Robert] complied with the terms of a contract that he "arrange financing" to make a payment to [Connie]. Counsel agreed that one of [Robert's] defenses to not completing the terms of the contract was that he was not able to arrange financing. As a result the Court can envision how his financial condition would be relevant to a trier of fact to evaluate on whether he had been able to "arrange financing" to complete payment of the contract obligations.

At trial, Connie testified Robert agreed at mediation to buy her interest in the real estate and business for $250,000 and that he would obtain a release of her individual guarantees of corporate indebtedness. She considered the Settlement Memorandum a contract. She acknowledged she had received three checks[2] from the liquidation of Happy Homes' assets and that she had been released from liability on Happy Homes' indebtedness. Connie asked that she

---

[2] The first was in November 2012 in the amount of $88,225.88; the second on September 9, 2013, in the amount of $52,417.40, which was Connie's half of the proceeds after Robert purchased the Happy Homes real estate; and the final check on March 13, 2014, in the amount of $15,128.50 after all Happy Homes' business dealings were finalized.

be awarded the difference between the $250,000 promised and what she had already received.[3]

In January 2010, Robert's financial statement with his bank, State Central Bank, indicated his net worth was over $2,720,000. Robert agreed he had signed the settlement memorandum and "agreed to purchase Connie's interest in the business and the real estate for $250,000, and she would also get the truck she wanted." Robert testified he went to his bank and sought financing to pay Connie, offering the assets of Happy Homes as collateral. He did not offer his personal family assets as collateral because "personal family assets and this does not get mixed in with a business." He also stated he went to a distant relative, who was a banker in Illinois, and asked for a loan and was denied. He did not fill out a loan application at either bank.

Robert also testified as follows:

> Q. Did you ever attempt to use your personal finances to obtain a loan? A. No, I did not.
> Q. And would you agree that had you used your personal finances, you could have obtained financing? A. I wouldn't say that.
> Q. Well, you could have paid for it yourself, couldn't you? A. No, I couldn't have.
> Q. Did you purchase the real estate that Happy Homes had been on at the auction? A. Yes, I did.
> Q. Did you get a loan for that? A. No, I just took it out of the proceeds.
> Q. What do you mean, the proceeds? A. The sale of the buildings.
> Q. The auction? A. The houses, tools and everything, my half.

---

[3] Connie contended she was owed about $96,000. Robert contended she had been paid $16,000 more than she acknowledged. The jury found Connie was owed just over $80,000, apparently giving credence to the additional payment. Connie does not appeal the amount of the judgment.

Q. So when that real estate was purchased by you, you did not need any kind of loan for that at all? A. I think I might have had a loan on it.

Q. Who did you get the loan from? A. Family.

Q. What family? A. I don't think that's necessary.

Q. Well, you paid a hundred thousand dollars for real estate, right? A. Yes.

Q. Over a hundred thousand, didn't you? A. A little over.

Q. And you got a loan from a family member? A. (No audible response.)

Q. Yes? A. Yes.

Q. But you couldn't go to that family member and get a loan to purchase Happy Homes from Connie? A. No.

Q. All right. So after you made the two attempts, meeting with Scott Piper and then meeting with your distant relative in Lima [Steve Harms], you made—that's all the attempts you made to finance the business? A. That's correct.

Robert acknowledged he did not go to other banks in the area seeking financing. Nor did he use "the $168,000 cash on hand" to get a loan.

Scott Piper at State Central Bank testified he denied Robert's request for a loan of $250,000 because Robert wanted the loan secured by Happy Homes' real estate and "the mobile homes that were left," and Piper was "concerned" the depreciated inventory would not be sufficient collateral. Piper also testified he would have been aware of Robert's financial statement and financial assets, and Robert could have offered to use his personal finances to secure a loan but did not. Piper testified:

Q. And you were aware they had pretty substantial financial assets? A. I knew they had a farm, uh-huh.

Q. Well, did you have the net worth statement that indicated their net worth was $2,720,348? A. Probably did. I—that was a long time ago.

. . . .

Q. Those are pretty sound financial investments, right? A. Well, those are—that's a nice net worth—

Q. Sure. A. —yeah.

Q. Especially if you secure it somehow with let's say real estate or property that you can take, if it doesn't get paid? A. Right, absolutely.

The court granted Robert's request that the jury be instructed on his claims of lack of consideration, waiver, and impossibility of performance. However, the court rejected his requested two instructions concerning conditions precedent. The jury returned special interrogatories finding there was a contract, Robert had breached the contract, and Connie should be awarded $80,267.49. Robert's motion for judgment notwithstanding the verdict was denied, as was his motion for new trial. Robert timely filed this appeal.

## II.

We review actions tried at law for errors of law. Iowa R. App. P. 6.907. Findings of fact in a law action are binding on us if supported by substantial evidence. Iowa R. App. 6.904(3)(a). "When reasonable minds would accept the evidence as adequate to reach the same findings, evidence is substantial." *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008). We review refusals to give jury instructions for correction of errors at law. *Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 669, 707 (Iowa 2016). Evidentiary rulings are reviewed for an abuse of discretion. *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718 (Iowa 2014). "A court abuses its discretion when its ruling is based on grounds that are unreasonable or untenable." *Id.* (citation omitted).

## III.

### A.

Robert argues "the Settlement Memorandum was not a binding contract— only an agreement to agree." He maintains that because additional papers were

required to finalize the sale of real property and corporate stock, there was a "strong inference" the parties did not intend to be bound.

"For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Schaer v. Webster Cty.*, 644 N.W.2d 327, 338 (Iowa 2002). "The contract terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). "Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds." *Id.* In deciding whether there is an enforceable contract, we consider not only the language used but also the surrounding circumstances and the conduct of the parties. *McCarter v. Uban*, 166 N.W.2d 910, 913 (Iowa 1969).

Viewing the evidence in the light most favorable to upholding the verdict as we must, *see Royal Indem. Co.*, 786 N.W.2d at 846, we conclude there is substantial evidence in support of the verdict. The language of the settlement memorandum repeatedly provides the parties reached an "agreement." Moreover, the actions taken after the parties signed the agreement provide objective evidence of mutual assent. The parties agreed "to take all action and execute all documents necessary to effectuate this agreement." The parties' attorneys began drafting the documents that would transfer Connie's shares in the company and achieve the real estate transfer. "[W]here parties have agreed upon all essential facts there is a binding contract, notwithstanding the fact that a more formal contract is to be prepared and signed later." *McCarter*, 166 N.W.2d at 914. Finally, Robert testified the parties had reached an agreement, but he

could not obtain financing necessary to perform. There is substantial objective evidence to support the jury's finding of a binding contract.

B.

Robert contends the district court should have provided an instruction on the issue of condition precedent.[4] The district court must give a requested jury instruction if the instruction (1) correctly states the law, (2) has application to the case, and (3) is not stated elsewhere in the instructions. *Beyer v. Todd*, 601 N.W.2d 35, 38 (Iowa 1999); *see Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) ("It is error for a court to refuse to give a requested instruction where it 'correctly states the law, has application to the case, and is not stated elsewhere in the instructions.'" (citation omitted)). "Parties are entitled to have their legal theories submitted to the jury if they are supported by the pleadings and substantial evidence in the record." *Beyer*, 601 N.W.2d at 38. "When we weigh the sufficiency of the evidence to support a requested instruction, we review the evidence in the light most favorable to the party seeking the instruction." *Weyerhaeuser v. Thermogas Co.*, 620 N.W.2d 819, 824 (Iowa 2000). "Error in giving or refusing to give a particular jury instruction does not

---

[4] Error was preserved on the issue. The district court held a conference regarding the instructions and specifically and unequivocally refused Robert's proposed instructions regarding condition precedent. The matter was raised again via posttrial motion, and the district court denied the motion. Under these circumstances, error was preserved. *See Ostrem v. State Farm Mut. Auto. Ins. Co.*, 666 N.W.2d 544, 547-48 (Iowa 2003) (explaining the court takes a "pragmatic view" to rule 1.924 and holding error is preserved where the instruction was requested or objection made, the point of law or question of fact was explained, and the district court ruled upon the matter); *State v. Wright*, 274 N.W.2d 307, 312 (Iowa 1979) (holding error was preserved where objection was made and proposed instructions were deemed "final" for purposes of error preservation).

merit reversal unless it results in prejudice to the party." *Wells v. Enter. Rent-A-Car Midwest*, 690 N.W.2d 33, 36 (Iowa 2004).

In *Khabbaz v. Swartz,* 319 N.W.2d 279, 283 (Iowa 1982), our supreme court defined a condition precedent:

> "Conditions precedent are . . . those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." *Mosebach v. Blythe*, 282 N.W.2d 755, 759 (Iowa Ct. App. 1979); 3A *Corbin on Contracts*, § 628 at 16 (1960); *see* 5 S. Williston, *A Treatise on the Law of Contracts*, § 666A at 141-44 (Jaeger ed. 1961). "A determination that a condition precedent exists depends not on the particular form of words used, but upon the intention of the parties gathered from the language of the entire instrument." *Mosebach*, 282 N.W.2d at 759.

Robert submitted two jury instructions on condition precedent, citing *Gildea v. Kapenis*, 402 N.W.2d 457 (Iowa 1987):

> [Proposed No. 3] Conditions precedent are those facts and events occurring subsequent to the making of a valid contract that must exist or occur before there is a right to immediate performance and before there is a breach of contract duty and before judicial remedies are available.

> [Proposed No. 4] Where conditions precedent cannot be met to satisfy the terms of the contract, the contract is void.

Under the circumstances, we conclude it was prejudicial error for the district court to decline to give the instructions. *See M.K. Metals, Inc. v. Container Recovery Corp.*, 645 F.2d 583, 587–89 (8th Cir. 1981) (finding prejudicial error where the court failed to give a condition precedent instruction); *see Deboom*, 772 N.W.2d at 5. The proposed instructions correctly stated the law and were not stated anywhere else in the instructions. *See Beyer*, 601 N.W.2d at 38. The instructions were supported by substantial evidence in the

record. Specifically, the settlement memorandum specifically provided it was "subject to Robert Kunz being able to arrange financing for this purchase." Robert testified he attempted to obtain financing from two lenders, one of which had a years-long banking relationship with Robert and Happy Homes, and was declined.

On appeal, the parties dispute whether Robert made a good faith effort to fulfill the condition precedent (for example, should he have contacted additional lenders, or was it enough to contact the lender with whom he had a longstanding business relationship) and thus whether the parties had a duty to perform. *See Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990) ("A contract imposes upon each party a duty of good faith in its performance and enforcement." (citing Restatement (Second) of Contracts § 205 (1981)). It is the jury's duty to resolve factual questions, and the jury is free to believe or disbelieve the witnesses' testimony. *Estate of Hagedorn ex rel. Hagedorn v. Peterson*, 690 N.W.2d 84, 88 (Iowa 2004) ("[T]he credibility of witnesses is peculiarly the responsibility of the fact finder to assess."). Whether Robert was able to "arrange financing" or made a good faith effort to "arrange financing" is a question for the jury, and the district court should have instructed the jury on the issue. In the absence of an instruction on the issue, the jury was not able to resolve the fact question.

We hold the failure to give the condition precedent instruction was prejudicial and requires a new trial.

C.

We choose to address an issue that might arise at retrial. Robert maintains his personal finances were irrelevant to the issues at trial and the court

erred in allowing evidence of his personal assets. Robert's personal finances would be probative of whether he made a good faith effort to obtain financing. The Settlement Memorandum was silent as to the means by which Robert would arrange financing for the purchase of Connie's interest in Happy Homes. Robert argues the agreement did not require him to use his personal assets. Had Robert wished to include such a condition upon his financing of the purchase of Connie's interest, he was free to do so. He did not. We will not read such a condition into the parties' agreement. Robert's personal financial assets were relevant to his ability to finance his purchase of Connie's shares. We find no error.

IV.

For the above stated reasons, we reverse the judgment of the district court and remand for new trial.

**REVERSED AND REMANDED.**

Doyle, J., concurs; Danilson, C.J., partially dissents.

**DANILSON, Chief Judge.** (concurring in part and dissenting in part)

I concur and agree with the majority except I part ways with the majority on the issue of whether Robert was prejudiced by the failure to give his requested instructions on condition precedent. Under the circumstances presented here, I conclude the failure to give the requested instructions did not prejudice Robert. I note the issue of whether Robert was able to arrange financing was litigated at trial. Robert's failure to obtain financing was urged as a basis and in support of his defense of impossibility. The jury apparently rejected Robert's testimony he was not able to arrange financing. I also acknowledge the distinct difference between impossibility and a good faith attempt. But it is significant that Robert's refusal to pledge any of his personal assets and his attempt to obtain financing solely on the basis of the company's assets was undisputed. Moreover, it is clear the mediation agreement does not afford him that privilege. A good faith attempt to obtain financing required he use any of his assets as a pledge or security to obtain financing. I conclude the failure to instruct the jury on conditions precedent was not prejudicial and does not constitute reversible error.

I would add that Robert has failed to preserve error by failing to object to the instructions in their final form. *See* Iowa R. Civ. P. 1.924.[5] Robert did

---

[5]Rule 1.924 provides, in part:

> Before the argument to the jury begins, the court shall furnish counsel with a preliminary draft of instructions which it expects to give on all controversial issues, which shall not be part of the record. Before jury arguments, the court shall give to each counsel a copy of its instructions in their final form, noting this fact of record and granting reasonable time for counsel to make objections, which shall be made and ruled on before arguments to the jury. Within such time, all objections to giving or failing to give any instruction must be made in writing or dictated into the record,

request jury instructions on condition precedent after the court provided its preliminary draft instructions, which request was denied.  He did not, however, object to the final form of the instructions—leaving nothing to be considered on appeal.  *See id.*

---

out of the jury's presence, specifying the matter objected to and on what grounds.  No other grounds or objections shall be asserted thereafter, or considered on appeal.