**IN THE COURT OF APPEALS OF IOWA**

No. 14-2150
Filed November 12, 2015


**DENNIS DELANEY, Individually and As Parent
and Next Friend of DEREK DELANEY**
        Plaintiffs-Appellees,

**vs.**

**DANIELLE LEE BOGS, DURHAM SCHOOL
SERVICES, LP; WILMINGTON TRUST COMPANY,
as TRUSTEE OF DSS TRUST; and NATIONAL
EXPRESS CORPORATION,**
        Defendants-Appellants.
_____


        Appeal from the Iowa District Court for Johnson County, Douglas S.

Russell, Judge.


        The defendants appeal from judgment entered in favor of plaintiffs in this

personal injury case. **AFFIRMED.**


        Thomas R. Weiler of Langhenry, Gillen, Lundquist & Johnson, L.L.C.,

Chicago, Illinois, and John F. Fatino and Matthew D. Jacobson of Whitfield

& Eddy, P.L.C., Des Moines, for appellants.

        Craig A. Levien and Amanda M. Richards of Betty, Neuman & McMahon,

P.L.C., Davenport, for appellees.



        Heard by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

The defendants appeal from judgment entered in favor of plaintiffs in this personal injury case, arguing components of the damages awarded were improper and the amounts awarded were excessive and not supported by the evidence. They also contend the district court should have granted their motion for directed verdict on the claim of negligent training and supervision and the court erred in instructing the jury.

We find no error in the district court's determination the awards for loss of future earnings and loss of function were supported by substantial evidence. Particularly in light of the fact the jury was required to itemize damages, we presume the jury followed the instruction not to award duplicate damages. Our review of the record reveals an evidentiary source for the jury's calculation of damages. We affirm the trial court's conclusions that counsel's arguments in closing did not rise to a level of impropriety to warrant a new trial. We find no error in the trial court's determination the evidence supporting the elements of the plaintiffs' claim was sufficient to send to the jury on the record, and therefore the motion for directed verdict was properly denied. The jury instruction in respect to the applicable standard of care for the bus driver was not erroneous. Finally, the defendants' claim concerning the instruction on negligent training and supervision is not properly before us. For these reasons, we affirm.

**I. Background Facts and Proceedings.**

Derek Delaney was a fourteen-year-old high school freshman traveling to a wrestling tournament on December 4, 2010, when the driver of the bus in which he was riding lost control, and the bus rolled, landing on its side. It was "cold,

sleety, rainy conditions." The speed limit on the highway was sixty-five. An onboard recorder provided this activity report for the bus (exhibit 5):

| 6:59 AM | 63 mph | 16.1 mi |
|---------|--------|---------|
| 7:00 AM | 61 mph | 17.1 mi |
| 7:01 AM | 57 mph | 18.1 mi |
| 7:02 AM | 56 mph | 19.1 mi |
| 7:03 AM | 55 mph | 20.0 mi |
| 7:04 AM | 57 mph | 20.9 mi |
| 7:05 AM | 51 mph | 21.9 mi |
| 7:06 AM | - | 22.1 mi |
| 7:07 AM | - | 22.1 mi |
| 3:15 PM | - | 22.1 mi |

Nathan Schmueker, a deputy sheriff of Washington County, testified he observed "in my rearview mirror the bus attempting to pass the car behind me; and as it went into the fast lane of Highway 218 southbound it lost control, rolled and landed in the median of Highway 218." Another witness, however, testified the bus went into the left lane after it lost control and it was not passing another vehicle.

Danielle Bogs, the bus driver, testified:

> I remember it getting worse in the weather condition, like more rain, more sleet, and that is when I started to slow my speed. I remember seeing a car about a half a mile in front of me fishtailing, and then I lost sight of it. I'm not sure where it went. And it was about that time my bus had started fishtailing. I remember it going right and left, and then it swung around to the right. And that's all I remember until it was done and over with.

As a result of the rollover, Derek suffered a crush injury, a wedge compression fracture of his T-12 and L-1 vertebrae. Derek was required to wear a back brace for more than two months to protect the spine from further injury. On February 10, 2011, he was allowed to discontinue wearing the brace and

gradually increase his activities.[1]  He returned to participating in sports in the fall—his sophomore year.

Plaintiffs (Derek and his father, Dennis Delaney) brought this personal injury suit against Bogs; her employer, Durham School Services, LP (DSS); its parent company, National Express Corporation; and the owner of the school bus, Wilmington Trust Company.  The Delaneys asserted Bogs was negligent in operating the school bus, and DSS was negligent in failing to properly train and supervise Bogs.

A jury trial was held July 29 to August 4, 2014.  At the close of the Delaneys' case in chief, the defendants moved for a directed verdict on the claim of negligent training and supervision, which was denied.  The defendants' motion for a directed verdict on the claim for punitive damages was granted.  The court provided proposed jury instructions and overruled the defendants' objections to Instructions 11 and 22, which concerned the claims of negligent training and supervision.  The jury returned verdicts finding Bogs sixty percent at fault and DSS forty percent at fault.  The damages awarded were as follows:

| | |
|---|---|
| 1. Past medical expenses | $2280.59 |
| 2. Future medications | $6000.00 |
| 3. Past Pain and Suffering | $15,000.00 |
| 4. Future Pain and Suffering | $150,000.00 |

---

[1] Dr. Lash's notes from February 10, 2011, include the following:

> Derek is here today in followup of his wedge compression fracture of T12 and L1.  He may also have a low-grade fracture at L2.  It happened on 12/4.  That was 68 days ago.  At this time he is not having back pain, he does not have pain at night, and when he is walking around and active with or without the brace he does not have pain.  He has been good and has not overstepped his balance.
>     . . . .
>     PLAN: Healing is a process and we have covered that with him, so he is going to come out of the brace and gradually increase his activities, with emphasis on gradually.

| 5. Loss of Future Earning Capacity | $320,000.00 |
| 6. Past Loss of Function of the body | $2500.00 |
| 7. Future Loss of Function of the body | $150,000.00 |
| TOTAL: | $645,780.59 |

The defendants requested a new trial pursuant to Iowa Rule of Civil Procedure 1.1004 asserting (1) the record of evidence was insufficient to sustain an award of future damages; (2) the awards of future damages for pain and suffering, loss of earning capacity, and loss of function were duplicative; (3) the verdict was "flagrantly excessive" and "shocks the conscience"; (4) the verdict was the result of "passion and prejudice"; (5) the court erred in instructing the jury on Durham's alleged failure to properly train and supervise Bogs because of insufficient evidence on that claim; and (6) the court erred in its standard of care instruction. In the alternative, the defendants requested a remittitur of damages of $470,000 by removing the awards for lost future earning capacity and loss of future function.

Following a November 3, 2014 hearing, the court entered a written ruling denying the post-trial motions. The court found that had it been a bench trial, it might have reached a different verdict, but it had "no right to set aside a verdict just because it might have reached a different conclusion." *Lubin v. City of Iowa City*, 131 N.W.2d 765, 767 (1965). The district court quoted *Lantz v. Cook*, 127 N.W.2d 675, 677 (Iowa 1964):

> In jury trials controverted issues of fact are for the jury to decide. That is what juries are for. To hold that a judge should set aside a verdict just because he would have reached a different conclusion would substitute judges for juries. It would relegate juries to unimportant window dressing. That we cannot do.

The court then addressed each of defendants' claims and denied the post-trial motions:

> First, the Court concludes it was not in error in its instructions either as to the standard of care for bus drivers or the alleged failure of Defendant, Durham School Services, LP, to properly train or supervise Defendant, Danielle Bogs. The standard of care instruction was based on *Burton v. Des Moines Metropolitan Transit Authority*, 530 N.W.2d 696, 700 (Iowa 1995). The instruction on the alleged failure of Durham to properly train or supervise was based on the evidence in the record and was adequately specific. The Court will not grant a new trial based on these alleged errors.
>
> The record of evidence in the case was sufficient to submit the issues of future earning capacity and future loss of function to the jury. The Court did so under the standards set out in *East Broadway Corp., v. Taco Bell Corp.*, 542 N.W.2d 816 (Iowa 1996),[2] *Winter v. Honeggers' & Co.*, 215 N.W.2d 316 (Iowa 1974), and *Coleman v. Monson*, 522 N.W.2d 91 (Iowa Ct. App. 1994). These are the same standards applied by the Court in overruling the Defendants' motion for directed verdict during the trial.
>
> Upon review of the record of evidence, the Court cannot and does not conclude that the future damages awarded were duplicative, that they were flagrantly excessive or shocking to the conscience, or that the amount of damages raises the presumption that the verdict was the result of passion or prejudice. The Court has reviewed the case law authority submitted by the parties and considered the written arguments of both. The Court does not conclude that the "send a message" theme of Plaintiffs' closing argument was improper or exceeded the record. Nor does the Court conclude that the verdict was the result of passion or prejudice because it was for a large amount.

---

[2] In the *East Broadway Corp.* ruling, 542 N.W.2d at 820, the supreme court stated:

> Our review of the court's rulings on a motion for a directed verdict and judgment notwithstanding the verdict is well settled:
>
> > [W]here no substantial evidence exists to support each element of a plaintiff's claim, directed verdict or judgment n.o.v. is proper. Substantial evidence is that which a "reasonable mind would accept as adequate to reach a conclusion." Where reasonable minds could differ on an issue, directed verdict is improper and the case should go to the jury. The trial court must consider the evidence in a light most favorable to the nonmoving party. On appeal, we consider the evidence in a way most favorable to upholding the verdict.

(Citations omitted.)

The defendants appeal. They challenge the damages awarded on several grounds, contending the district court erred in failing to set aside the jury's verdict because (1) there was insufficient evidence for the awards of loss of future earning capacity and loss of future function; (2) the awards for future pain and suffering, loss of future earning capacity, and future loss of function were duplicative; (3) the amounts awarded were excessive and shock the conscience; and (4) the amounts awarded raise the presumption of being the result of passion or some ulterior motive. They also assert the court erred in denying their motion for directed verdict on the issue of negligent training and supervision and in instructing the jury on that claim.

**II. Scope and Standards of Review.**

"We review the denial of a motion for new trial based on the grounds asserted in the motion." *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012). The sufficiency of the evidence presents a legal question, and we review this ground for the correction of errors at law. *See id.*

The district court's denial of a motion for new trial based on the claim a jury awarded excessive damages is reviewed for an abuse of discretion. *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718-19 (Iowa 2014); *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49 (Iowa 2008).

We review a district court's ruling on a motion for directed verdict for correction of errors at law. *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009).

Finally, "[w]e review a claim that the district court gave an instruction not supported by the evidence for correction of errors at law." *Pavone v. Kirke*, 801 N.W.2d 477, 494 (Iowa 2011).

**III. Discussion.**

*A. Damages.* In Iowa, the plaintiff bears the burden of establishing a claim for damages with some reasonable certainty and for demonstrating a rational basis for determining their amount. *Conley v. Warne*, 236 N.W.2d 682, 687 (Iowa 1975); *Hammes v. JCLB Props., LLC*, 764 N.W.2d 552, 558 (Iowa Ct. App. 2008). Yet, Iowa courts "take a broad view in determining the sufficiency of evidence of damages." *Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 403 (Iowa 1982). We also recognize a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. *Olson v. Nieman's Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998). As our supreme court observed in *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 857 (Iowa 1973): "If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." "Some speculation is thus acceptable." *Olson*, 579 N.W.2d at 309. While a loss may be hard to ascertain "with preciseness and certainty, the wronged party should not be penalized because of that difficulty." *Id.*

The various elements of damages presented to the jury about which defendants complain include future pain and suffering, loss of future earning

capacity, and future loss of function, all of which have been discussed in our case law.

*Future pain and suffering.*

> Physical pain and suffering includes bodily suffering, sensation, or discomfort. Mental pain and suffering includes mental anguish, anxiety, embarrassment, loss of enjoyment of life, a feeling of uselessness, or other emotional distress. Damages for physical and mental pain and suffering cannot be measured by any exact or mathematical standard and must be left to the sound judgment of the jury.

*Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 347 (Iowa 2005); *see also Triplett v. McCourt Mfg. Corp.*, 742 N.W.2d 600, 603 (Iowa Ct. App. 2007) ("While the amount of future medical expenses may be a factor when calculating future pain and suffering, we find its importance is limited when the plaintiff will continue to suffer pain despite achieving the maximum level of recovery from the accident.").

*Loss of future earning capacity.*

The loss of future earning capacity is "'the difference between the value of an individual's services, if working, as he would have been but for the injury, and the value of the services of an injured person, if working, in the future.'" *Sallis v. Lamansky*, 420 N.W.2d 795, 798 (Iowa 1988) (quoting *Anthes v. Anthes*, 139 N.W.2d 201, 208 (Iowa 1965)). "It is the loss of earning capacity that is compensable, not the loss of earnings." *Sallis*, 420 N.W.2d at 798. Such damage is to be measured by the impairment of general wage earning capacity and not the loss of wages for a specific occupation. *Id.*

*Loss of function.*

As to the loss of function, "this element of damage relates to functional impairment as opposed to structural impairment of the body. It is the inability of a particular body part to function in a normal manner." *Brant v. Bockholt*, 532 N.W.2d 801, 804-05 (Iowa 1995).

1. *Sufficiency of the Evidence for Damage Awards.* The defendants contend there is insufficient evidence of a loss of future earning capacity and loss of future function to sustain those awards by the jury. As enunciated in *Coleman*, 522 N.W.2d at 93,

> A court ruling on a motion for directed verdict must view the evidence in the light most favorable to the nonmoving party. Movant is considered to have admitted the truth of all evidence offered by nonmovant and every favorable inference that may be deduced from it. To overrule the motion the court must find substantial evidence in support of each element of nonmovant's claim. If reasonable minds could differ, an issue is for the jury.

(Citations omitted.) *Accord Hagenow v. Schmidt*, 842 N.W.2d 661, 664 (Iowa 2014) ("We view the evidence in the light most favorable to the jury verdict."); *Sallis*, 420 N.W.2d at 799.

On appeal, the defendants assert that because Derek currently demonstrates no loss of function and has yet to choose a career path, any loss of future earning capacity or loss of function are purely speculative. They point out their own expert's opinion that Derek would not suffer any loss of earning capacity. But upon our review of the record, viewed in the light most favorable to upholding the verdict, we find no error in the district court's determination that the awards for loss of future earnings and loss of function were supported by substantial evidence.

Dr. Edward Lash, Derek's orthopedic surgeon, opined Derek was "very, very, very likely to have chronic pain" and there was a high likelihood he would develop posttraumatic arthritis.[3]  And further, because his spine was now "malaligned," "the muscles and supporting elements in that area have to work harder which causes muscle fatigue"; "[t]he deformity also changes the movement at that area which puts increased strain on the discs at that level and at the adjacent levels particularly the one below"; and "the malaligned joint, it's going to wear out."  When asked about the likelihood of these developments, Dr. Lash testified, "I think it's going to happen, that it will happen.  So I guess that—I would say there would be a 90 percent or better chance that there are going to be, at least, these objective abnormalities that occur."  Dr. Lash also explained arthritis in this area of the back could impact Derek's "bowel, bladder function, sexual function, and the lower extremities—in terms of power, motor function and sensory function" and "sensation."

Dr. Lash testified Derek suffered an impairment, a rating for which could be determined from the AMA Guides to the Evaluation of Permanent Impairment.

Dr. Michael Cullen, who is board certified in psychiatry and neurology, testified about Derek's compression fracture:

> The front part of the anterior part of the vertebral body is shaped like a rectangle or a square.  And to have a wedge compression fracture, the front part of that rectangle, or square, or cube . . . is compressed; and the height is reduced, compared to the back side of that cube . . . .  It is a deformity of the normal architecture of the bone.

---

[3] He also testified that arthritis in this position in the spine is "not very common" absent an injury in the general population.

Dr. Cullen testified that in June 2011 Derek reported ongoing low back pain. He opined there was a "distinct possibility"—"more probable than not"—Derek would be prone to a premature degenerative arthritic spinal condition. He explained:

> An arthritic condition is that there is a mechanical force that works on the bony structure. Although we think of bony—bones as being this hard, for the most part, non-breakable material, once—once there is a mechanical stressor and a reactionary deformity, then there is more of a prevalence, or more of a tendency, for that to continue as far as the reshaping of the bone. . . .
>
> And so that's what has started at a relatively young age. And hence, there is an imbalance, as far as the mechanics, the biomechanics, of bone wear and tear and response to mechanical stressors.

Derek testified about the accident and that he feels pain "[e]very day. It's just something that I have to learn to live with." He acknowledged he told Dr. Lash in February 2011 (still a freshman in high school) he was not in pain. He explained,

> It is what I said, but it may not have been 100 percent how I felt. I always, even still today, have dull pain. . . . I was an active kid. I was tired of missing out on sports and tired of not being able to go with my friends and stuff.

Derek testified he was currently working in an auto shop. He stated he had been accepted into an area community college and planned to study criminal justice. His father testified, however, Derek was most likely to be a laborer—like his father and grandfather.

The jury awarded damages for loss of future earning capacity in the amount of $320,000 and for future loss of function of the body in the amount of $150,000. Dr. Lash opined it was very likely Derek would experience early onset posttraumatic arthritis. And the loss-of-earning-capacity damages awarded are within the range of the evidence presented by the plaintiffs.

Lewis Vierling, who prepared a vocational rehabilitation evaluation and report, testified:

> Q. [by plaintiffs' attorney] Again, Mr. Vierling, can you tell the jury to a reasonable degree of vocational certainty what your opinion is regarding Derek's loss of earning capacity based on your vocational rehabilitation evaluation? A. Yes. I determined that he would have a loss of earning capacity especially if as the doctors have indicated he will—that his condition should get worse, and that he would have some difficulties in the labor market, that he may well as we have seen in many cases have to retire early or change types of occupations, pull out of the labor market.
> In this case, I identified the normal retirement of, say, age 67, and then looking at Derek, if he were to retire or be pulled out of the workplace for whatever reason at age 60 and then at age 57. So there's seven years and a ten-year review of the situation. In that case, he would earn less over time. And my total loss of earning capacity for retirement and early retirement at age 60 was 495,000 to 525,000. And if he were to retire at age 57 for the reasons related to his health, it was 595,000 to 645,000.
> . . . .
> Q. Can you say while the period he's working what impact do you view his injuries having on him? A. I would see them impacting his ability to work that full length of what we expect— Work life expectancy basically is up to age 67. Many people retire beforehand. . . . Many people retire early. They are unable to continue in the workplace. . . .
> Q. And what's your best estimate as to whether these injuries will impact his retirement age whether it will be earlier or later? A. I believe based on my experience with cases like this and with people with injuries, that over time especially during the aging process past 35 and 40 when additional complications begin to set in, that he will not be able to—I think it's a reasonable probability, more likely than not, that he will not be able to work the full period of time and will need to leave the workplace earlier than he might not have.

Vierling testified the occupation of police officer is "generally referred to as a medium requirement in terms of physical demands." He continued:

> [B]ut there are other demands. What we refer to as nonmaterial handling demands, that would be more of a concern than just the weight limit that the department—the police department has established.

Q. [by defense attorney] So the medium exertion level is an exertion level that you feel Derek will be capable of doing throughout his life—work life, correct? A. In terms of the material demands, material handling, that medium falls within that category. And I believe that he'll be able to do that in terms of just the material handling demands, not necessarily all the other demands of a particular job.

. . . .

Q. You aren't saying Derek Delaney can't apprehend suspects now if he were a police officer, were you? A. No, I'm not saying that.

Q. Do you feel that he would be more than capable of doing that given his fitness and his strength? A. Today?

Q. Yes. A. Today that would probably not be a problem. Fifteen, twenty years from now, that may be a problem.

Q. So if this disability as you described it or the impairment move more into a disability, it's at that point Mr. Delaney will experience a diminished earning capacity in your opinion? A. I believe so.

On cross-examination, Vierling also stated:

Q. You are not saying that Derek Delaney will actually retire at 60 years of age or 57 years of age, are you? A. No, I'm not saying he'll actually retire at those ages. I was using those ages as possibilities related to his condition and related to the circumstances perhaps at the time. But those were the two that I selected based upon his medical records, based upon his history and information that I have and also based upon my years of experience.

. . . .

A. Again, statistically and from the medical information, we don't know when the difficulties are going to take place. The doctors—Two different doctors have indicated that onset of arthritis and osteoarthritis will occur early, probability that they will occur earlier, at least ten years earlier than what most people experience.

So I'm going by what the doctors are saying in terms of— relating that to his earning capacity into the future.

To summarize, Dr. Lash stated the compression of Derek's vertebrae is a permanent anatomical change in Derek's spine that will exist for the rest of his life. Further, Dr. Lash testified it is very likely Derek will develop arthritis, shortening his ability to do heavy or physical work. Moreover, there is a good

chance Derek is going to have encroachment on the spinal cord, the locus of which serves the bowel and bladder functions, sexual function, and the lower extremities in terms of their power and motor function.

Vierling testified he considered several scenarios: (1) assuming normal development had the accident not occurred; (2) with injury, graduating high school, and entering the labor market; (3) normal development with one or two years postsecondary education; and (4) with the injury and one or two years postsecondary education. He noted Derek may come out of the workplace early due to medical complications from his injury, may not be able to work the number of hours required in his job, especially if it is very physically demanding, and there also may be time periods where he is not able to work between jobs or because of an aggravation of his injuries. Vierling calculated Derek's loss of earning capacity due to this accident: if Derek retired at age sixty, his total loss of earning capacity was $495,000-$525,000 and if he were to retire at age fifty-seven, the loss would be $595,000-$645,000.

The defendants complain Vierling is not an economist. "[I]t is not necessary to produce the expert testimony of an economist in order to generate a jury issue on the question of projected economic loss." *Vasconez v. Mills*, 651 N.W.2d 48, 57-58 (Iowa 2002) (citing *Carradus v. Lange*, 203 N.W.2d 565, 569 (Iowa 1973) (holding plaintiff's personal testimony regarding educational and work limitations "adequately generated" a jury issue on the right to damages for impairment of earning capacity)).

The jury awarded damages for loss of future earning capacity in the amount of $320,000, and we conclude these damages awarded are within the

range of the evidence presented by the plaintiffs. Such damages for Derek are certainly more difficult to ascertain than someone with a work history or a fixed disability. But Derek presented proof of a reasonable basis from which the amount could be approximated. *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 857 (Iowa 1973).

The defendants also contend there is no evidence to support the future-loss-of-function damages. We disagree. As stated above, Dr. Lash opined that there was a "good chance" traumatic arthritis "will impact his spinal cord over time." He explained:

> The little joints in the back of the spine if you malalign those joints, they are going to become arthritic. They are going to become arthritic under load. They are going to become arthritic. And as they become arthritic, they get bigger and so they take up space. And there's no extra space in the spinal canal at T-12, L-1 to accommodate anything extra. The spinal canal diameter where the spinal cord goes is a very tight fit.
>
> Now, below that in the lower part of the lumbar spine and in the cervical spine, the spinal canal diameter is much bigger. So there's plenty of room for the nerve elements there. So you got to have a greater degree of encroachment on that canal to create nerve problems.
>
> And this is why thoracic discs are a much worse problem than a cervical disc herniation or a lumbar disc herniation. It has to do with the amount of space available at that level.
>
> If you have not much space available extra and you put a little extra something in there (indicating), it's going to create trouble. So I think there's a good chance that it will—that he's going to have encroachment on the spinal cord in that area. But it may or may not—he may not be aware of it.
>
> Q. What area of the body does that area serve? A. Again, the bowel and bladder function, sexual function and the lower extremities in terms of their power, motor function and sensory function, sensation.

Dr. Lash also testified that pain can impact function, and Derek testified that he currently has pain intermittently that has become worse in the level of pain. The jury was entitled to give weight to this testimony.

The jury could reasonably determine Derek was injured, suffered past loss of function, and would likely suffer a loss of function in the future. We decline to disturb the award of $150,000 for this element of damages. *See Olsen v. Drahos*, 229 N.W.2d 741, 742 (Iowa 1975) (noting that when "the verdict is within a reasonable range as indicated by the evidence we will not interfere with what is primarily a jury question").

*2. Were Damages Awarded Duplicative?* The defendants next argue the damage awards for future pain and suffering, loss of future earning capacity, and future loss of function were duplicative. The jury here was instructed that it could consider awarding damages for loss of function of the body, loss of earning capacity, and future pain and suffering. Here, the jury was explicitly instructed not to duplicate damages. We also note the jury was reminded on two occasions during defense counsel's closing arguments to refrain from awarding duplicate damages. While there may be a risk that the award for loss of function may duplicate the pain and suffering award, *see generally Poyzer v. McGraw*, 360 N.W.2d 748, 753 (Iowa 1985), because the jury was required to itemize its damages, this risk was minimized. *See id.* (noting a "function of special verdicts is to compel a jury to more accurately focus on what it properly should"). We presume the jury followed the jury instruction admonishing the jury not to award duplicate damages. *See Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 15 (Iowa 1990).

*3. Were Damages Awarded Excessive or the Result of Passion?* The defendants contend, too, that the damages awarded were excessive and the result of passion and prejudice. *See* Iowa R. Civ. P. 1.1004(4). As already noted, we review the denial of a motion for new trial based on the claim a jury awarded excessive damages for an abuse of discretion. *Giza*, 843 N.W.2d at 718-19. "An abuse of discretion occurs when the court's decision is based on a ground or reason that is clearly untenable or when the court's discretion is exercised to a clearly unreasonable degree." *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004). The assessment of damages is traditionally a jury function with which "we are loath to interfere." *Sallis*, 420 N.W.2d at 799; *see also Olsen*, 229 N.W.2d at 742; *Triplett*, 742 N.W.2d at 602.

Our review of the record reveals an evidentiary source for the jury's calculation of damages. *See WSH Props.*, 761 N.W.2d at 50-51 (finding "the evidentiary basis for the jury's assessment of damages dispels any presumption that the excessiveness of the verdict was motivated by passion"). Taking the "broad view of the evidence," *Hammes v. JCLB Props., LLC*, 764 N.W.2d 552, 558 (Iowa Ct. App. 2008), because the verdict is within a reasonable range of the evidence, the district court did not abuse its discretion in denying the motion for new trial. Derek is a young man who will suffer the consequences of this injury his entire life. The evidence suggests the activities he can participate in now may be far different over time, perhaps an acknowledgment that modern medicine does not have a permanent "fix" for this type of injury.

*B. Misconduct.* The defendants raise a claim that plaintiffs' closing and rebuttal arguments amounted to misconduct and raised the passions of the jury. During closing arguments, plaintiffs' counsel stated:

> The verdict form is on the back and there is a series of—it's actually six questions that you will answer.
>
> Question number one. Was Mrs. Bogs, Durham School Services, and DSS Trust at fault in operating the school bus? Yes or no. The evidence, I believe, shows that that should be yes.
>
> Was the fault of those three a cause of damage to Plaintiff? You heard that if the evidence shows that, that should be yes too.
>
> Number three. Was Durham School Services at fault for negligent training and supervision of Danielle Bogs? *If you want to send a message* to improve your training, the answer should be yes if that's what you believe the evidence to be.
>
> Was the negligent training and supervision a cause of injuries to Derek? You can answer yes if you find that to be.
>
> And then there's question number five. And that's the question of what is the percentage of fault between Mrs. Bogs and the school district—I'm sorry, and the bus company in operating the vehicle and in supervising?
>
> Now that, you can put whatever figures you want. I wrote in 51 and 49 percent on mine; 51 percent in the operation, 49 percent in sending Mrs. Bogs or anyone like her out there in those conditions with it. *You want to send a message* and prove it, increase that number.
>
> But I would just suggest that you keep the number—the first number above 51 percent because ultimately the operation of the vehicle and the rolling of this vehicle is what caused the injuries. But it's certainly the supervision and the training could be greatly improved.

(Emphasis added.) And on rebuttal, plaintiffs' counsel stated:

> It's not the lawyers, it's Durham School Services that are trying to send you jurors a message, a message that they can pay experts more than they can pay a 14-year-old young boy whose back they broke in two places, a boy that came from Florida to try and make his way here in Iowa in our community, a boy who enjoyed playing football and wrestling, a boy who had some dreams that were shattered and will live with him the rest of his life.
>
> It's Durham School Services and some company called the DSS Trust that doesn't even have somebody sitting in your courtroom that is trying to send you jurors a message. You know what that message is, ladies and gentlemen. It's three "nots."

We're not responsible. He's not injured. And, worst of all, he's not worthy of a fair compensation over his lifetime.

That's the message from a school bus company that puts children on their advertisements. Well, there's a remedy to that folks, and eight of you are sitting in the Johnson County Courthouse, and you'll decide whether that is a proper way to defend themselves.

. . . .

And three weeks from now, the back to school bells are going to start ringing. We're going to put our children on buses again, school buses operated by Durham School Services.

And your verdict will *send a message*. What are we going to require in our community in terms of the safety of our children? What's more important? A yellow bus full of students going to an activity or a school or tractor trailers sailing down Interstate 80.

Who should be the best trained? The best drivers that we have out there. Why didn't they explain that to you? Because they *sent the message* to you that they don't have to be here. That all they have to do is come in and say award 25-or 30,000 to a 14-year-old who broke his back in two places.

You do have the power to make it right. You have the power to find the truth and do justice. There is no shame in vindicating the value of an individual student at these levels (indicating).

Anything much less than that Durham will declare a victory and go on to the next bus accident and not show. And Defendants. The same way. The same way they defended this one.

(Emphasis added.)

No objections were raised by defense counsel at the time the arguments were made. *See Tindell v. State*, 629 N.W.2d 357, 359 (Iowa 2001) ("[O]bjections must be raised at the earliest opportunity after the grounds for the objection become apparent."). The defendants contend on appeal, "It may be presumed . . . Plaintiff's counsel's arguments in closing and rebuttal to 'send a message' to Defendants, and particularly to the corporate defendant, Durham, inflamed the jury's passions and caused them to award Derek a much higher amount for these damage categories than the evidence warranted." We acknowledge that our supreme court has long recognized "misconduct in

argument may be so flagrantly improper and evidently prejudicial" that it may be a ground for new trial even though counsel did not take exception when the argument was made. *Connelly v. Nolte*, 21 N.W.2d 311, 317 (Iowa 1946). However, the trial court here did not find the statements rose to such a level of impropriety, and we agree.[4]

The use of the phrase "send a message" was used as it related to the verdict sought and the defendants' position at trial. Counsel argued the defendants' were attempting to "send a message" that the verdict for such an injury be in the range of $25,000 to $30,000. Although the use of such a phrase may invite some passion and should be avoided, the phrase was not used so frequently that we are able to conclude a different result would have been reached absent the use of the phrase.

*C. Negligent Training and Supervision.* The defendants next argue that the district court erred in denying their motion for a directed verdict on the claim of negligent training and supervision and in its instructions to the jury on that claim.

The defendants moved for a directed verdict on the claim of negligent training and supervision, arguing the plaintiffs had failed to establish what was required of DSS to train and supervise Bogs. Plaintiffs questioned Bogs as to

---

[4] When faced with a motion for new trial premised on alleged misconduct by counsel, courts must undertake a two-step inquiry. *See Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 802–03 (Iowa 1992). First, the court must determine whether counsel violated a motion in limine or otherwise made improper statements to the jury. *Id.* If the court finds the attorney engaged in misconduct, the general rule is that a new trial will be granted only if the objectionable conduct resulted in prejudice to the complaining party. *Id.* at 803. "'[U]nless it appears probable a different result would have been reached but for the claimed misconduct of counsel for the prevailing party,'" the court is not warranted in granting a new trial. *Id.* (citations omitted).

her training, and she testified that prior to coming to work at DSS she had never been employed as a driver in any capacity. She applied at DSS because the ad stated "no experience needed." After being hired, Bogs underwent a two-week training program offered by DSS, which consisted of driving a bus four hours per day. Bogs was not trained on snow and ice. She was not instructed on bus rollovers. The defendants note the State of Iowa issued Bogs a commercial driver's license (CDL), which allowed her to drive a school bus; Bogs had held the license for just under two years at the time of the accident, and her license had never been suspended, revoked, or restricted in any way.

The district court observed:

> And I say this as concerns both the conduct of Ms. Bogs as the driver and the conduct of Durham as employer hirer, supervisor and trainer.
> Counsel on both sides are well aware of all the facts. There is a dispute about the nature of her entering the left lane of the roadway. There is substantial evidence from the deputy that she was intending to pass. There is contradictory evidence for Mrs. Bogs from the supervisor.
> But I think given all the facts considered and having some experience as the fact-finder myself, I do not find that there is substantial evidence that would allow the punitive damages claim to go to the jury.
> So the motion for directed verdict as to punitive damages against all Defendants is granted.
> Now do counsel wish to be heard on the common carrier issue at this time or do you want to do that after we're done?
> Mr. Weiler [for defendants]: I think we can do that during the instruction conference, Your Honor.
> The Court: All right, Mr. Levien, would that suit you as well?
> Mr. Levien [for plaintiffs]: That's fine. Is that all the directed verdicts that are being done at this time?
> The Court: Mr. Weiler, anything further in the line of directed verdicts?
> Mr. Weiler: I don't think so, Your Honor.

The court's proposed instructions with respect to the negligence claims provide as follows:

## INSTRUCTION NO. 11

"Negligence" means the failure to use ordinary care. Ordinary care is the care which a reasonably careful person would use under similar circumstances. "Negligence" is doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances. The duty of a school bus driver is to exercise the care that an ordinary prudent bus operator would exercise in looking after the safety of a child in his or her charge of the age of the pupil involved.

## INSTRUCTION NO. 13

Iowa Code provides that in all cases where damage is done by any motor vehicle by reason of negligence of the driver, and driven with the consent of the owner, the owner of the motor vehicle shall be liable for such damage.

It is stipulated that at the time of the accident Danielle Bogs was operating a school bus owned by DSS Trust with its consent.

Therefore, if you find Danielle Bogs liable in this matter, DSS Trust, as the owner of the school bus, shall also be liable.

## INSTRUCTION NO. 14

The Plaintiff claims that Danielle Bogs was at fault in one or more of the following particulars: Negligence.

This ground of fault has been explained to you in other instructions.

In order to recover damages, the Plaintiff must prove all of the following propositions:

1. Danielle Bogs was negligent in one or more of the following particulars:
   a. Failing to maintain control of her vehicle;
   b. Failing to keep a proper lookout;
   c. Driving at an excessive speed for conditions;
   d. Failing to exercise reasonable care under all circumstances;
   e. Attempting an unsafe pass.
2. The negligence was a cause of the Plaintiffs damages.
3. The nature and extent of damage.

If the Plaintiff has failed to prove any of these propositions, he is not entitled to damages. If the Plaintiff has proved all of these propositions, the Plaintiff is entitled to damages in some amount.

INSTRUCTION NO. 20
An employer is liable for the negligent acts of an employee if the acts are done in the scope of employment.  It is stipulated that Danielle Bogs was driving the school bus in the scope of her employment with Durham School Services, LP, at the time of the accident.

INSTRUCTION NO. 22
The Plaintiffs assert that Durham School Services, LP is at fault for the following particular: Negligent training and supervision of Danielle Bogs.
The Plaintiffs must prove all of the following propositions:
1. Durham School Services was negligent in one or more of the following ways:
a. Failing to properly train Danielle Bogs to operate a school bus;
b. Failing to properly supervise Danielle Bogs.
2. The negligence was a cause of damage to the plaintiff.
3. The amount of damage.
If the Plaintiffs have failed to prove any of these propositions, the Plaintiffs are not entitled to damages form Durham School Services, LP.  If the Plaintiffs have proved all of these propositions, the Plaintiffs are entitled to damages in some amount.

*1. Directed Verdict.*  "A directed verdict is required 'only if there was no substantial evidence to support the elements of the plaintiff's claim.'"  *Deboom*, 772 N.W.2d at 5 (quoting *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 472 (Iowa 2005)).   Evidence is substantial "[w]hen reasonable minds would accept the evidence as adequate to reach the same findings."  *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008).  "Where reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury."  *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 873 (Iowa 1989).  Consequently, we must determine whether the trial court correctly determined if there was substantial evidence to submit the issue to the jury.  *Easton*, 751 N.W.2d at 5.  In doing so, we must "view the evidence in the light most favorable

to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury." *Id.*

The defendants argue a directed verdict on negligent training and supervision should have been entered because "the Delaneys did not offer any evidence to establish that the exercise of ordinary care by a reasonably prudent bus company required Durham to do anything more than properly train and supervise" Bogs and they offered no evidence as to what was "proper training or supervision." The defendants assert instruction 22 is a tautology, offering the jury no guidance.

We note, however, that the defendants argued in respect to the jury instruction:

> With respect to the alleged failure to train and supervise, as we discussed on Friday the only—the only way Durham School Services or any of the other corporate Defendants can be found to be at fault is if Danielle Bogs is first found to be negligent.
> There is no need to include a failure to train or a failure to supervise instruction since the damages are the same. It does not add anything to the case, and it all depends upon a finding of negligence on the part of Danielle Bogs. In addition to the fact that we believe there was insufficient evidence of both the failure to train and failure to supervise claims.
> So we would object to the inclusion of instruction number 22 and as well as the inclusion of those elements on the verdict form.

This argument suggests the defendants were viewing the liability of the defendants other than Bogs under respondeat superior liability. However, claims of negligent training and supervision are "separate and distinct from those based on respondeat superior liability, which imposes strict liability on employers for the acts of their employees committed within the scope of their employment." *Kiesau*

*v. Bantz*, 686 N.W.2d 164, 172 (Iowa 2004). In *Kiesau*, our supreme court explained:

> We first recognized these causes of action [claims for negligent hiring, supervision, and retention] in *Godar v. Edwards,* 588 N.W.2d 701, 709 (Iowa 1999). These claims are based on Restatement (Second) of Agency § 213 (1957). Section 213 provides as follows:
>
>> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>>
>> . . . .
>> (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;
>> (c) in the supervision of the activity; or
>> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.
>> . . . .
>
> In *Schoff v. Combined Insurance Co. of America*, we decided a necessary element of a claim for negligent hiring, supervision, or retention is an underlying tort or wrongful act committed by the employee. 604 N.W.2d 43, 53 (Iowa 1999). Thus, an injured party must show the employee's underlying tort or wrongful act caused a compensable injury, in addition to proving the negligent hiring, supervision, or retention by the employer was a cause of those injuries. *Godar,* 588 N.W.2d at 708. In other words, the injured party must prove a case within a case.

686 N.W.2d at 171-72; *see also Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004) (setting forth the elements of a claim of negligent supervision).

The Delaneys argue the evidence presented to the jury was that the accident occurred when Bogs lost control in icy road conditions and that Bogs was instructed by DSS trainers the school bus was the safest vehicle on the road, was not trained how to properly operate the bus on snow and ice, was

never instructed on bus rollovers, and was not trained when to decide the road conditions were not safe to travel. In essence, they contend there was a complete absence of training on bus rollovers and driving a bus on the snow and ice so the adequacy of the training is not at issue. They assert it was for the jury to determine if the defendants were negligent by putting Bogs in charge of transporting minor children to and from school and events in snowy and/or icy conditions without any such training.

In overruling the motion for new trial on the same issue, the district court relied upon *Burton v. Des Moines Metropolitan Transit Authority*, 530 N.W.2d 696, 700 (Iowa 1995), which states,

> The law has established some specific duties owed by a school bus driver to pupil/passengers. When a relationship of school bus driver and pupil/passenger exists the driver must use the care that "an ordinarily prudent bus operator would exercise in looking after the safety of a child in his charge of the age of the pupil involved." . . . .
> . . . The duties of a school bus driver are defined by the duties imposed by the law on school districts, not the duties imposed on common carriers. The law charges school districts with the care and control of children and requires the school district to exercise the same standard of care toward the children that a parent of ordinary prudence would observe in comparable circumstances.

(Citations omitted.)

In *Thompson v. Kaczinski,* 774 N.W.2d 829 (Iowa 2009), our supreme court adopted the principles of the Restatement (Third) of Torts: Liability for Physical Harm and held, "An actionable claim of negligence requires 'the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.'" *Thompson,* 774 N.W.2d at 834 (citations omitted).

We find no error in the trial court's determination that the evidence supporting the elements of the plaintiffs' claim was sufficient to send to the jury on the record, and therefore the motion for directed verdict was properly denied. The plaintiffs presented evidence that Bogs received two weeks of training and no training about driving in snow and ice or rollovers. The evidence also showed the weather conditions on the day of the accident were less than ideal and that Bogs informed the wrestling coach she did not want to be driving. While the fact that Bogs obtained her CDL was relevant to her training, the school district remained responsible for assuring Bogs drove in a safe and reasonable manner, and it was for the jury to determine if the supervision of Bogs on the day of the accident was done in a reasonable manner.

*2. Instructions.* We finally turn to the defendants' claim the district court improperly instructed the jury. Here, the defendants argue the court erred in respect to the applicable standard of care for Bogs and the elements of negligent training and supervision lacked specifications of negligence. "We evaluate the alleged instructional error from the perspective that a trial court is generally required to give a requested instruction 'when it states a correct rule of law having application to the facts of the case.'" *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004) (quoting *Stover*, 434 N.W.2d at 868).

> We will affirm the submission of an instruction if substantial evidence supports it. Substantial evidence is that which a reasonable person would find adequate to reach a conclusion. . . . Error in giving or refusing to give a jury instruction does not warrant reversal unless it results in prejudice to the complaining party. Instructions must be considered as a whole, and if the jury has not been misled there is no reversible error.

*Hagenow*, 842 N.W.2d at 670 (citations and internal quotation marks omitted).

As to Instruction No. 11, the defendants challenged this language added to the "standard negligence instruction"—"The duty of a school bus driver is to exercise the care that an ordinary prudent bus operator would exercise in looking after the safety of a child in his or her charge of the age of the pupil involved." We do not find the additional language to be objectionable as it is in accord with *Burton*, 530 N.W.2d at 700 ("When a relationship of school bus driver and pupil/passenger exists the driver must use the care that 'an ordinarily prudent bus operator would exercise in looking after the safety of a child in his charge of the age of the pupil involved.'" (citation omitted)). Thus, we cannot conclude there was any prejudice to the defendants by the additional language.

The defendants also argue the instruction failed to state what acts may constitute the negligent training and supervision. In respect to the lack of specification of Instruction No. 22, we conclude the defendants did not preserve error on this issue. The defendants levied a general objection to the instruction stating the instruction, "does not add anything to the case." The trial court was not alerted to this alleged error. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**AFFIRMED.**