# IN THE COURT OF APPEALS OF IOWA

No. 16-0735
Filed October 11, 2017


**THE HANSEN COMPANY, INC.,**
        Plaintiff-Appellant,

**vs.**

**REDNET ENVIRONMENTAL SERVICES, L.L.C., LYNN KNUDSEN, and ROBERT KNUDSEN,**
        Defendants-Appellees.
_____

**REDNET ENVIRONMENTAL SERVICES, L.L.C., LYNN KNUDSEN, and ROBERT KNUDSEN**,
        Counterclaim Plaintiffs,

**vs.**

**THE HANSEN COMPANY, INC.,**
        Counterclaim Defendant.
_____


        Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.


        The Hansen Company, Inc. appeals from an adverse jury verdict in this breach-of-contract action. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Martin J. Demoret and Ross W. Johnson of Faegre Baker Daniels L.L.P., Des Moines, and Jeffrey D. Stone of Whitfield & Eddy, P.L.C., Des Moines, for appellant.

Matthew G. Sease of Kemp and Sease, Des Moines, Todd M. Lantz of the Weinhardt Law Firm, Des Moines, and Jeremy R. Masterson of Masterson & Bottenberg, L.L.P., Waukee, for appellees.

Heard by Danilson, C.J., and Tabor and McDonald, JJ.

**DANILSON, Chief Judge.**

The Hansen Company, Inc.[1] appeals from an adverse jury verdict after a five-day trial. The parties had entered into a contract involving a demolition project of the Younkers building located in Des Moines. The jury determined Hansen breached the contract and committed willful and wanton conduct resulting in a verdict for compensatory damages in the amount of $1,381,387 and punitive damages of $250,000. In a nutshell, Hansen contends the claim for punitive damages should have been dismissed, the compensatory verdict should have been set aside because of insufficiency of the evidence, and the damages awarded were not supported by the evidence and were excessive. We affirm on the compensatory-damages verdict and reverse the award of punitive damages.

**I. Background Facts & Proceedings.**

The trial began upon RedNet's[2] breach-of-contract and fraudulent-misrepresentation claims, but RedNet withdrew the fraud claim at the close of its evidence.[3] On appeal, Hansen contends the district court erred in overruling its motions for directed verdict, motion for judgment notwithstanding the verdict, and alternative motion for new trial.

The parties entered into a stipulation prior to trial that the following facts were true and undisputed:

---

[1] Hereafter referred to as "Hansen."

[2] We shall refer to all of the appellees—RedNet Environmental Services, L.L.C., Lynn Knudsen, and Robert Knudsen—as "RedNet" unless otherwise identified. Lynn Knudsen was president and Robert Knudsen was vice president of RedNet.

[3] The action was initiated by Hansen's petition claiming damages for RedNet's libelous conduct, but that claim was dismissed before trial. RedNet's claims arose by counterclaim.

1. In the spring of 2013 RedNet Environmental Services and the Hansen Company entered into a contract to perform work on the property located at 713 Walnut Street, Des Moines, Iowa.

2. Pursuant to the contract, RedNet Environmental Services was to perform asbestos abatement, lead abatement, PCB/Mercury disposal and demolition on the property.

3. Before RedNet Environmental Services was allowed to perform any of the contracted work on the project, the Hansen Company terminated RedNet Environmental Services' contract on August 23, 2013.

We adopt the following partial summary of the preliminary facts noted by

the district court in its ruling on post-trial motions:

RedNet was a business owned by Robert and Lynn Knudsen that performed demolition and hazardous material abatement work. The Knudsens owned other companies that were interrelated, most prominently, Redstone Painting, which was started in 2006. The Knudsens started RedNet in 2011. Lynn Knudsen was the president of RedNet and Rob Knudsen was vice president. However, Rob Knudsen was the face of the company and actively managed its activities in the field. Lynn primarily performed office work.

Hansen is a general contractor [that] was hired to renovate the former Younkers Building in downtown Des Moines. On April 1, 2013, Hansen issued a request for proposal (RFP) for demolition and hazardous material abatement at the Younkers building. Rob Knudsen was very familiar with the building as he had worked in the building for Hansen for approximately [twenty] years. RedNet had submitted a bid based on an earlier RFP in 2011, but the project did not proceed forward at that time. In April of 2013, RedNet submitted a bid of $3,330,100, which did not include pricing on options. Tony Garcia from Hansen informed Mr. Knudsen that RedNet was not the low bidder, but invited an amendment with a breakdown on the work so he could better compare it with other bidders. Following that, Mr. Knudsen informed Mr. Garcia that RedNet would pass on the project.

In mid-June of 2013, Hansen contacted RedNet and asked if it would be willing to submit a new bid. Hansen had learned that the subcontractor would not have to pay Davis-Bacon wages, which was expected to substantially reduce the cost of project. RedNet agreed to submit a new bid in light of the new information. RedNet ultimately presented a bid of $2,655,100 that allowed it to keep and sell all scrap pulled from the building. RedNet estimated the scrap as an additional $257,000 in revenue. This bid was accepted by Hansen. The parties stipulated that a contract was formed at that

time, although they dispute some terms of the contract. The parties agreed that work often begins on a project before a final written contract is executed.

RedNet prepared for work on the Younkers project. Work was initially scheduled to start on July 15, 2013. RedNet applied for a permit to remove asbestos from the building and filed notices with other government agencies. RedNet purchased needed supplies. The start date was delayed, but Hansen continued to confer with RedNet while preparing for the project. As an example, the parties met on July 11, 2013, to sort through contract terms, scope of work, schedules, and other matters. As of that meeting, work was expected to begin on August 5, 2013.

(Footnote omitted.)

However, by late July 2013 circumstances began to arise that gave cause for the instant action. On July 26, 2013, Knudsen sent a letter to the president of Hansen, Craig Faber, regarding discrepancies with the asbestos and lead inspection reports provided by Hansen. The discrepancies, according to Knudsen, could result in widespread exposure to asbestos to other subcontractors and violate many laws and even result in imprisonment. About the same time, and although the parties had worked together in many prior projects, Hansen had become increasingly concerned about the financial viability of RedNet and Knudsen's related companies. Redstone was providing space for RedNet's headquarters but Redstone's landlord filed a forcible entry and detainer action to evict Redstone in mid-July. RedNet had also subcontracted some of the labor on the demolition contract to Redstone, and Hansen received notice that Redstone's workers' compensation policy had been cancelled. On behalf of Hansen, Garcia contacted Knudsen on two occasions expressing concern about RedNet's ability to complete the demolition project and the rumors that the

Knudsen companies were near bankruptcy. Knudsen insisted Redstone's problems would not affect RedNet.

Ultimately, Hansen's bonding company recommended that Hansen obtain a bond from RedNet for the demolition project to protect Hansen in the event RedNet could not complete the project. On August 12, 2013, Garcia notified Knudsen of the recommendation for a bond and gave RedNet until August 21, 2013—later extended to August 23—to procure a bond. Garcia also represented that Hansen would pay for the bond. Lynn Knudsen stated a bond had never been required of RedNet in any other project. Further, the project specifications did not recite a bonding requirement and no other subcontractor employed by Hansen was required to submit a bond. Garcia admitted that at the time the contract was awarded no bond was required. Craig Hansen, owner and chief executive officer of Hansen, acknowledged it was his decision to require a bond of RedNet, and if a bond was not provided, RedNet would not be permitted to work on the project. Nonetheless, Knudsen made efforts to procure a bond.

Due to RedNet having been recently formed (in 2011) and its financial condition—caused in large part by accounts receivable that were not being paid—RedNet had difficulties obtaining a bond by Hansen's deadline. Although Knudsen located a friend who could arrange for the bond, the efforts were ceased when Knudsen learned on August 26, 2013, Hansen had decided to move on with a new subcontractor. The next day, RedNet closed its business.

Hansen pled and raised at trial the defense that it was fraudulently induced to enter into the contract by representations made by RedNet or the Knudsens. Jury Instruction No. 20 informed the jury that if the defense of

fraudulent inducement was proved, Hansen was entitled to rescind the contract, and RedNet was not entitled to damages.

The defense of fraudulent inducement was premised upon e-mail communications from the Knudsens after the initial bids in 2013. In a May 2, 2013, 3:11 a.m. e-mail sent by Robert Knudsen to Craig Faber, Knudsen expressed disappointment that RedNet was not selected for the Younkers project. The e-mail also explained how Knudsen's companies were all doing well financially and how RedNet had been sought out to bid on the project, and then later told the Younkers project was "off the table" for RedNet. About a month and a half later, Hansen decided to rebid the project and requested RedNet to submit a new bid without the Davis-Bacon wages. Hansen contends this was essentially a negotiated bid and Hansen had the opportunity to select whomever they desired to employ.

In a later e-mail by Lynn Knudsen, she expressed that their bank had doubled their line of credit. Hansen claims that what this e-mail failed to disclose was that the line of credit was already "maxed" out. Hansen claimed the financial information in the e-mails was false, and it relied upon the information to decide to accept RedNet's second bid. But Hansen never requested any financial information from RedNet until August 17, 2013. By that date, Hansen had a bid from another company that Hansen had solicited two or more weeks earlier.

Throughout the time the other company was working on their bid, Hansen made representations to RedNet that suggested everything was proceeding forward, including selecting additional options to the contract and setting the date to begin work. Initially, work was to begin July 15, then it was moved to August

5, then to August 15, then to August 21, and finally, RedNet was told they were off the job on August 26, although RedNet was able to obtain a bond the very next day. During the time between the acceptance of the bid and late August, RedNet did extensive work preparing for the job.

Hansen also contends that even if it breached the contract, there was no evidence RedNet suffered damages as a result of the breach; RedNet was a new company and its evidence could not support the damages awarded; and punitive damages were not proper because there was no intentional tort. RedNet sought damages for lost profits. Robert Knudsen testified to a breakdown of RedNet's bid based upon the plans, reports, labor cost, and materials. The bid also included an estimated profit of $1,124,387, with a total contract price of $2,655,100. The profit was calculated into the bid based upon production rates of other jobs and RedNet's profits on past jobs. Past jobs included the Des Moines building, the Fleming building, Quality Manufacturing, and Southridge Mall. In addition, under the contract, RedNet was entitled to sell any scrap from the project, totaling an estimated $257,000 in additional profits. Hansen argues that due to RedNet's financial condition it could not have finished the job to earn such profits. Because of the loss of the contract, RedNet was forced to close its doors.

RedNet's claim for punitive damages is based upon the facts surrounding Hansen's termination of the contract. RedNet contends Hansen knew the financial significance of the Younkers project to RedNet; Hansen was aware RedNet turned down another project to purse the Younkers project at Hansen's request; Hansen was aware of RedNet's cash flow problems and the forcible

entry and detainer action against one of its related companies, yet still allowed RedNet to prepare to begin work on the project including attending preconstruction meetings; and Hansen unreasonably requested RedNet to obtain a bond although it was not a part of the original agreement, no other subcontractor was required to post a bond, and Hansen knew it would be difficult for RedNet to obtain a bond. RedNet claims in addition to these facts supporting willful and malicious conduct, three specific communications reflect personal spite and ill will. First, on a draft written subcontract agreement, Hansen's project manager (Anderson) wrote that he hoped the Knudsens and their companies "rot in hell." Second, upon terminating RedNet's contract, Faber communicated to RedNet, "[N]ext time don't bite the hand that feeds you." Finally, in an e-mail from Faber to Garcia after RedNet's termination, Faber said Hansen should make similar requests for bond from any replacement subcontractors or else it would "kill [them] if this comes up later."

## II. Preservation of Error.

RedNet contends three arguments raised on appeal by Hansen were not properly preserved for our review. Ordinarily, we only review issues that have been raised and decided by the district court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). If an issue raised by a party is not decided, the party must "request a ruling from the district court to preserve error for appeal." *Id.* at 539. Where a party makes a request and the district court "generally overrules the motion without addressing its specifics, error is preserved." *Ellis v. City of Le Mars*, No. 11-1239, 2012 WL 1612003, at *5 (Iowa Ct. App. May 9, 2012).

According to RedNet, the three arguments not preserved are (1) the claim the contract was modified to include the bond requirement, (2) Hansen's claim of lack of causation for damages, and (3) the claim that RedNet failed to mitigate damages. We agree.

With respect to issues (1) and (3), Hansen neither pled nor sought jury instructions relative to a contract modification or a duty to mitigate damages, and, therefore, has failed to preserve error on those issues. *See Tarrell v. Erdmann*, 221 N.W.2d 504, 507 (Iowa 1974) (noting jury instructions stand as the law of the case and timely objections must be made to the instructions to preserve error).

As to issue (2)—causation—Hansen's motion for judgment notwithstanding the verdict included an argument on the sufficiency of the evidence to show causation, but the court never ruled on the issue. Further, "[a] motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 845 (Iowa 2010). The issue of causation was not raised by Hansen in its motion for directed verdict.[4] Accordingly, the issue of causation was not preserved by the motion for judgment notwithstanding the verdict.

Hansen's alternative motion for new trial incorporated all grounds in the motion for judgment notwithstanding the verdict. But Hansen has not raised on appeal a claim that its motion for new trial should have been granted because

---

[4] Hansen's motion for directed verdict raised in part that the damages sought were speculative, and, in support of that issue, Hansen argued there was no evidence that RedNet could complete the project. But Hansen made no claim there was insufficient evidence of causation.

RedNet failed to prove its damages were caused by Hansen's breach. Thus, Hansen has failed to preserve error on the issue of causation.

**III. Punitive Damages in Contract Cases.**

On appeal, Hansen contends punitive damages should only be afforded in a contract action if there is an intentional tort. Because RedNet dismissed its intentional tort claim of fraud at the close of its case, Hansen contends it was entitled to a directed verdict on the claim of punitive damages. We need not reach this argument because RedNet simply failed to present sufficient evidence of an intentional tort.

Before the Iowa legislature stepped into the picture, punitive damages could be awarded in a breach-of-contract case under the following principles:

> (1) Punitive damages cannot be recovered for breach of contract;
> (2) Punitive damages may be recovered when the breach also constitutes an intentional tort, or other illegal or wrongful act, if committed maliciously;
> (3) It is sufficient if the malice is only legal malice, that is, committed or continued with a willful or reckless disregard of another's rights;
> (4) The intentional tort or other illegal or wrongful act may occur at the time of and in connection with the breach; but
> (5) A wrongful act in this context is not committed merely by breaching a contract, even if such act is intentional.

*Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 920 (Iowa 1979).

The term legal malice was explained in *Claude v. Weaver Construction Co.*, 158 N.W.2d 139, 144 (Iowa 1968):

> The rule would seem to be: exemplary damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of defendant, liability for exemplary damages is not

based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused. *See Mendenhall v. Struck*, 224 N.W. 95, 97 (Iowa 1929) ("Malice does not necessarily mean spite or hatred, but it means the doing of an actual wrong in itself without just cause or excuse.").

In 1986, the Iowa legislature entered the fray and provided the following restrictions or principles on punitive damages:

> (1) In a trial of a claim involving the request for punitive or exemplary damages, the court shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating all of the following:
> (a) Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.
> (b) Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived.

1986 Iowa Acts ch. 1211, § 42 (now codified at Iowa Code § 668A.1).

After the passage of the legislation, our case law becomes somewhat murky. In *Hockenberg Equipment Co. v. Hockenberg's Equipment & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 156 (Iowa 1993), the court stated, "[W]e will uphold an award of punitive damages when conduct breaching a contract also constitutes an intentional tort, committed maliciously, that meets the standards of section 668A.1." But in so stating, the court cited to *Pogge*, a pre-section 668A case. *See id.* As previously observed in *Pogge*, the court stated that punitive damages were permitted when the breach "constitutes an intentional tort, or other illegal or wrongful act, if committed maliciously." 277 N.W.2d at 920.

Four years later, our supreme court explained the current state of law with respect to punitive damages: "We will only uphold an award of punitive damages for breach of contract when the breach (1) constitutes an intentional tort, and (2) is committed maliciously, in a manner that meets the standards of Iowa Code section 668A.1 (1993)." *Magnusson Agency v. Pub. Entity Nat'l Co-Midwest*, 560 N.W.2d 20, 29 (Iowa 1997). A wrongful or intentional breach is not enough to afford punitive damages. *Id.* Clearly, in *Magnusson* no reference was made nor was there any analysis discussing whether illegal or wrongful conduct done maliciously could still support a claim for punitive damages in a breach-of-contract claim. The Iowa Supreme Court has reiterated its *Magnusson* holding in *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999), and in *Graves v. Iowa Lakes Community College*, 639 N.W.2d 22, 28 (Iowa 2002).[5] Accordingly, we can only conclude that illegal or wrongful conduct done maliciously is no longer sufficient to support punitive damages in a breach-of-contract claim absent an intentional tort.[6]

We also observe that to meet the standard of section 668A.1 actual or legal malice must be shown. *McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000). "Actual malice is characterized by such factors as personal spite, hatred, or ill will." *Id.* "Legal malice is shown by wrongful conduct committed or

---

[5] *Graves* was overruled on other grounds by *Kiesau v. Bantz*, 686 N.W.2d 164, 173 (Iowa 2004).

[6] We acknowledge the difficulties the trial judge may have encountered on this issue because neither section 668A.1 nor the Uniform Iowa Civil Jury Instructions make reference to the requirement of proof of an intentional tort. Moreover, during argument on the motion for directed verdict, Hansen's counsel first stated, "In terms of punitive damages, your honor, the standard is willful and wanton behavior," although later in argument counsel referenced the requirement of an intentional tort.

continued with a willful or reckless disregard for another's rights." *Id.* Punitive damages "serve three purposes: (1) punishment, (2) specific deterrence, and (3) general deterrence." *In re Vajgrt*, 801 N.W.2d 570, 575 (Iowa 2011).

Recently, our supreme court summarized our standard of review relative to motions for a directed verdict:

> We review a ruling on a motion for a directed verdict for correction of errors at law. "We review the evidence in the light most favorable to the nonmoving party . . . ." In doing so, we take into consideration all reasonable inferences the jury could fairly make, regardless of whether there is any evidence in contradiction. Ultimately, we decide whether the district court's determination that there was or was not sufficient evidence to submit the issue to the jury was correct.

*Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017) (citations omitted).

The only viable intentional tort raised by RedNet in resistance of the motion for directed verdict was its claim of fraudulent misrepresentation.[7] The conduct relied upon by RedNet to support this claim consisted of Hansen seeking RedNet's bid; requiring RedNet to expend time and monies to continue its preparations to be ready for the start date that was continually extended; informing RedNet to obtain a bond although not required by the contract terms or of other subcontractors; arranging for another subcontractor to perform the work while stringing RedNet along; and terminating the contract at the very last moment. Such conduct was clearly willful and intentional. And the comments of Anderson (hoping the Knudsens and their companies "rot in hell") and Faber ("[n]ext time don't bite the hands that feeds you"), and the acknowledgement that

---

[7] RedNet's brief also alleges battery, but we are unable to find even a scintilla of evidence of proof of a battery.

future subcontractors should be required to post a bond because this would "kill [them] if this comes up later," are comments indicative of actual spite and hatred (although legal malice does not require spite or hatred). *See McClure*, 613 N.W.2d at 231. Nonetheless, we conclude the evidence falls short of fraudulent misrepresentation.

To establish a claim for fraudulent misrepresentation, RedNet had the burden of proving each of the following elements: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (quoting *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)).

Here, RedNet and Hansen were already contractually bound to perform their respective ends of the bargain, which necessarily would have required RedNet to prepare to begin work. We are unable to ascertain any reliance upon a statement that caused any separate damages incurred by the tort. The requirement of a performance bond as a term of the proposed, but unexecuted written agreement was reasonable in light of RedNet's financial condition. Ultimately, RedNet did not procure a performance bond or incur expenses for a bond. Hansen did conceal the fact that it was considering a different subcontractor after being upset with Knutsen's letter raising concerns about discrepancies in asbestos and lead reports—discrepancies that could have caused the cost of abatement and the risk of harm to increase. However, if Hansen had been unable to find another subcontractor we do not know if Hansen would have permitted RedNet to perform the work. Moreover, the concealment

of Hansen's alternative plans with another subcontractor did not create any damages separate and independent from the contractual damages.[8]

**IV. Motion for Judgment Notwithstanding the Verdict.**

***A. Standard of Review.*** Our standard of review in regard to a denial of a motion for judgment notwithstanding the verdict was stated in *Pavone v. Kirke*:

> "We review the denial of a motion for judgment notwithstanding the verdict for correction of errors at law." *Van Sickle Constr. Co.*[, 783 N.W.2d at 687] . . . .
> "A motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion." *Royal Indem. Co.*, 786 N.W.2d at 845; *accord Van Sickle Constr. Co.*, 783 N.W.2d at 687 ("[T]he motion for judgment notwithstanding the verdict must rely on the matters raised in a previous motion for directed verdict."); *Dutcher v. Lewis*, 221 N.W.2d 755, 760 (Iowa 1974) ("A motion for judgment notwithstanding the verdict cannot be sustained on any ground not asserted in an earlier motion for directed verdict."). "On appeal from such judgment, review by an appellate court is limited to those grounds raised in the directed verdict motion." *Royal Indem. Co.*, 786 N.W.2d at 845.

801 N.W.2d 477, 493-94 (Iowa 2011). If there is substantial evidence to support the plaintiff's claims, a motion for judgment notwithstanding the verdict should be denied. *Vogan v. Hayes Appraisal Assocs., Inc.*, 588 N.W.2d 420, 423 (Iowa 1999). The reviewing court must view "the evidence in the light most favorable to the party against whom the motion was made and takes into consideration every legitimate inference that may fairly and reasonably be made." *Id.*

***B. Analysis.*** Hansen contends the court erred in denying its motion for judgment notwithstanding the verdict, which raised three grounds (1) the parties' agreement required RedNet to post a bond, and RedNet breached the contract

---

[8] RedNet acknowledges in its brief that it moved to dismiss its claim of fraudulent misrepresentation in part because there were no damages separate and independent from the contract damages.

by failing to provide a performance bond; (2) RedNet's evidence of damages was speculative and was insufficient to support a claim for lost profits; and (3) there was insufficient evidence that Hansen's breach caused RedNet's damages. A fourth issue—whether there was substantial evidence to support punitive damages—was also raised in the motion and appears to be raised by Hansen on appeal.

*1. Substantial evidence of terms of an agreement.* The parties stipulated to the existence of a contract and remain bound to that stipulation. However, RedNet still had the obligation to prove the terms of the agreement as provided in Jury Instruction No. 11. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) ("In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.").

Hansen contends because there was no final written agreement, RedNet could not prove the terms of the agreement. However, this argument belies the parties' stipulation that the parties entered into a contract. The fact that the proposed final written contract may have encompassed more terms than the parties' stipulated contract is of no consequence. The issue for the jury was: What were the terms of the contract that the parties did enter?

The requirement of RedNet posting a bond was a topic of much discussion and was a term of the proposed written contract. RedNet even took

steps to obtain a bond. But the original bidding process did not require a bond, and the jury had sufficient evidence to conclude the terms of the parties' contract did not require a bond. Hansen did not contend the original agreement was modified by adding the term of a bond requirement, nor did it allege there was a separate oral agreement requiring a bond. Moreover, the jury was not instructed on such issues. Rather, the requirement of a bond was simply a term in the proposed written agreement that would have subsumed the original agreement but was never executed. There was substantial evidence of the terms of the agreement, those being RedNet was to perform demolition and asbestos abatement services on the Younkers building pursuant to the bid specifications without any bond obligation, and Hansen was to pay a total price of $2,655,100. The district court did not commit error by failing to grant the motion for judgment notwithstanding verdict on this ground.

**2. Lost profits.** Hansen contends RedNet was not entitled to lost profits as it was a new company with insufficient historical data and in such poor financial condition that it could not have completed the job.

> Iowa has long recognized the new business rule that considers "[e]xpected profits from a new commercial enterprise . . . too remote and speculative to warrant judgment for their loss because there are no available data of past business from which the fact of anticipated profits could have been established." *City of Corning v. Iowa–Nebraska Light & Power Co.*, 282 N.W. 791, 796 (Iowa 1938).
>> The rationale underlying the rule is that there is no available data of past business from which anticipated profits could be established. The rule, however, is not absolute. If factual data furnishing a basis for probable loss of profits is presented evidence of future profits may be admitted and its weight should be left to the fact-finder. Thus, the question is

> whether a prospective loss of net profits has been shown with reasonable certainty.

*Emp. Benefits Plus, Inc. v. Des Moines Gen. Hosp.*, 535 N.W.2d 149, 156 (Iowa Ct. App. 1995) (citations omitted).

> Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.

*Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968).

*Mid-American Bio AG, LTD v. Wieland & Sons Lumber Co.*, No. 10-0014, 2010 WL 3662305, at *7-8 (Iowa Ct. App. Sep. 22, 2010).

The new business rule is more frequently applied to damages to the business itself. Here, RedNet only sought lost profits on a single contract not future contracts or future business lost due to the breach. In other words, RedNet did not seek damages because it was forced to close its doors and could have made future profits had it continued in business. The only anticipated profit sought was the contract with Hansen, and RedNet's bid had been carefully prepared based upon past projects and profit margins. Hansen vigorously cross-examined Knudsen on the claimed profits, and the issue was a proper question for the jury. The new business rule did not require a judgment notwithstanding the verdict on the claim for lost profits unless the damages were otherwise speculative or uncertain.

*3. Were damages speculative?* Related to the new business rule is the requirement that damages not be speculative or uncertain, as we have previously noted. Hansen contends it was entitled to have the verdict set aside because

RedNet's financial condition was so precarious that it could not have stayed in business long enough to complete its performance under the contract. Thus, it could not have earned the profit it claims. We acknowledge RedNet faced a hurdle to complete the project because of its cash flow problems. The cash flow difficulties stemmed in large part from the failure to collect its account receivables, but RedNet's efforts to collect the monies continued. However, we are required to consider the evidence in a light most favorable to RedNet. RedNet explained how it would survive its cash flow difficulties through loans and sale of scrap metal until it began receiving monies under the contract. RedNet had completed major projects in the past few years when their business was in infancy. We conclude the damage claim was not so speculative or uncertain that Hansen was entitled to a judgment notwithstanding the verdict. There was substantial evidence to support the claim of damages and to submit the issue to the jury.

In sum, we conclude Hansen's arguments do not support granting a motion for judgment notwithstanding the verdict. There was no contractual agreement to require a performance bond, although it could have been added as a part of the parties' proposed but unexecuted written contract. RedNet's evidence was sufficient to raise a jury question on the lost profits sought by RedNet. In regard to damages, Hansen terminated the contract and, if RedNet had completed the project, it would have made a profit. The issue of whether RedNet could have completed the project because of its financial condition was a proper issue for the jury to determine, and we are unable to conclude it was error to deny the post-trial motion. Moreover, the jury could have concluded Hansen

terminated RedNet from the project because RedNet raised concerns about discrepancies in asbestos and lead reports—discrepancies that could have caused the cost of abatement and the risk of harm to increase.

**V. Motion for New Trial.**

***A. Standard of Review.*** This court has previously stated the standard of review for the denial of a motion for new trial:

> "We review the denial of a motion for new trial based on the grounds asserted in the motion." *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012). The sufficiency of the evidence presents a legal question, and we review this ground for the correction of errors at law. *See id.*
> The district court's denial of a motion for new trial based on the claim a jury awarded excessive damages is reviewed for an abuse of discretion. *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718-19 (Iowa 2014); *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49 (Iowa 2008).

*Delaney v. Bogs*, No. 14-2150, 2015 WL 7075815, at *3 (Iowa Ct. App. Nov. 12, 2015). In *Delaney*, the defendants contended "the damages awarded were excessive and the result of passion and prejudice." *Id.* at *10. The court further explained that in this context:

> "An abuse of discretion occurs when the court's decision is based on a ground or reason that is clearly untenable or when the court's discretion is exercised to a clearly unreasonable degree." *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004). The assessment of damages is traditionally a jury function with which "we are loath to interfere." *Sallis* [*v. Lamansky*], 420 N.W.2d [795,] 799 [(Iowa 1988)]; *see also Olsen* [*v. Drahos*], 229 N.W.2d [741,] 742 [(Iowa 1975)]; *Triplett* [*v. McCourt Mfg. Corp.*], 742 N.W.2d [600,] 602 [(Iowa Ct. App. 2007)].

*Id.*

***B. Analysis.*** Hansen's alternative motion for new trial incorporated the same grounds identified in its motion for judgment notwithstanding the verdict

and alleged three additional grounds. On appeal, Hansen contends it should have been granted a new trial because RedNet's mid-trial dismissal of its fraudulent misrepresentation claim caused unfair prejudice to Hansen because evidence was admitted on that claim, which was irrelevant to the breach-of-contract claim, thereby improperly and unfairly prejudicing the jury's awards. Second, Hansen asserts the jury awarded excessive damages. And third, Hansen argues the trial was tainted by an erroneous submission of an instruction on punitive damages causing the verdict to be influenced by passion or prejudice.

Even if we accept Hansen's claim that evidence was admitted in RedNet's case-in-chief that would not have been admissible solely on the breach-of-contract claim, Hansen has not cited any authority to support a new trial because evidence was admitted on a count that was subsequently dismissed. As the trial began, RedNet sought damages based upon fraudulent representation and breach of contract. There is nothing in this record that suggests RedNet or its counsel improperly brought the fraudulent representation claim or improperly dismissed it after its case-in-chief. Further, Hansen could have challenged the merits of the fraudulent representation cause of action by motion for summary judgment. Hansen could have also sought a limiting instruction. Hansen is not entitled to a new trial on this ground.

We also decline to grant a new trial on the basis that submission of the punitive damages claim inflamed the jury to award excessive damage awards, or that the jury otherwise awarded excessive compensatory damages. With respect to excessive damages our supreme court has stated,

> "In considering a contention that the verdict is excessive, the evidence must be viewed in the light most favorable to the plaintiff." We will only interfere with the jury's function "when the damage award is 'flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support.'" If a verdict meets this standard or fails to do substantial justice between the parties, we must either grant a new trial or require a remittitur.

*Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 869 (Iowa 1994) (citations omitted).

The jury in this action awarded the exact amount of profits RedNet claimed as compensatory damages. As we previously noted, the anticipated profit sought had been carefully prepared based upon past projects and profit margins. Hansen submitted no expert testimony to dispute the amount of profit RedNet could earn on the project. Further, although we are setting aside the punitive damage award, the award of punitive damages was only about one-fourth of the amount of compensatory damages, and such an award does not suggest a highly inflamed jury or jury award. *See Wolf v. Wolf*, 690 N.W.2d 887, 894-96 (Iowa 2005) ("The degree of reprehensibility of the defendant's conduct is said to be the most important indicium of the reasonableness of a punitive-damage award."). The jury's compensatory verdict does not shock the conscious, appear to be derived from passion or prejudice, and there is evidentiary support for the amount. *See Berryhill v. Hatt*, 428 N.W.2d 647, 658 (Iowa 1988) (affirming an award of compensatory damages and reversing an award of damages without requiring a new trial where the compensatory damages awarded were within the range of the evidence).

**VI. Conclusion.**

We conclude the district court improperly overruled Hansen's motion for directed verdict on the issue of punitive damages and reverse on that issue, but we affirm the judgment and verdict on compensatory damages. We remand with directions for an amended judgment entry striking the award of punitive damages.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**